## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
### ROCK ISLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 4:02-cr-40221 |
| ) | |
| RICHARD D. LEAR, ) | |
| ) | |
| Defendant. ) | |

## ORDER & OPINION

This matter is before the Court on Defendant Richard Lear's request for compassionate release. (Dkts. 50, 57). The Government has responded (dkt. 59), and Probation has filed a recommendation at the Court's direction (dkt. 51). This matter is ripe for review. For the following reasons, the Motion is denied.

### BACKGROUND

In 2003, Defendant was sentenced to 240 months' and 120 consecutive months' imprisonment after pleading guilty to conspiracy to manufacture methamphetamine and carrying a short-barreled shotgun in furtherance of a drug trafficking crime in violation of 21 U.S.C. §§ 846 and 841(b)(1)(A) and 18 U.S.C. § 924(c)(1)(B)(i). (Dkts. 51 at 1; 39 at 3). Defendant is currently projected to be released on December 11, 2028. (Dkt. 51 at 1).

The instant motion arises from health concerns amidst the ongoing COVID-19 pandemic. (Dkt. 57 at 2). Defendant is incarcerated at Federal Correctional Institute (FCI) Pekin (doc. 51 at 1), where there are currently no active COVID-19 cases among

the inmate population, no inmate deaths, and 9 active cases among staff; 726 inmates and 78 staff members were previously infected and have recovered. *COVID-19*, Fed. Bureau of Prisons, https://www.bop.gov/coronavirus/ (last visited June 10, 2021).[1] COVID-19 vaccines are being administered at FCI Pekin; so far, 123 staff and 553 inmates have been fully inoculated. *COVID-19*, Fed. Bureau of Prisons, https://www.bop.gov/coronavirus/ (last visited June 10, 2021).[2]

---

[1] The BOP website contains the following disclosure:
> These data are compiled from a variety of sources and reviewed by BOP Health Services staff before documented for reporting. **Not all tests are conducted by and/or reported to BOP.** The number of positive tests at a facility is not equal to the number of cases, as one person may be tested more than once. The number of tests recorded per site reflects the number of persons currently in BOP custody at the specific facility who have been tested, whether at that site or at a prior facility.

*COVID-19*, Fed. Bureau of Prisons, https://www.bop.gov/coronavirus/ (last visited June 10, 2021) (emphasis in original). The website further indicates there have been 1,182 COVID-19 tests conducted at FCI Pekin, 0 are pending, and there has been a total of 726 inmates with positive tests. *Id.*

[2] The BOP website contains the following information about vaccine data:
> The information in this area of the resource page is updated each weekday at 3:00pm EDT. It is compiled from a variety of sources and reviewed by BOP Health Services staff before documented for reporting. The locations in the table below have received allocations of the vaccine. The numbers in the table only reflect staff and inmates that are fully inoculated . . . .

*COVID-19*, Fed. Bureau of Prisons, https://www.bop.gov/coronavirus/ (last visited June 10, 2021).

## LEGAL STANDARD

The First Step Act amended 18 U.S.C. § 3582(c)(1)(A) to allow defendants to ask the sentencing court for compassionate release. Pub. L. No. 115-391 § 603(b), 132 Stat. 5194, 5239. The decision whether to grant compassionate release is within a district judge's discretion, the standard for which is set by § 3582(c)(1)(A). *United States v. Gunn*, 980 F.3d 1178, 1180–81 (7th Cir. 2020). Under the statute, there are three requirements.

First, a defendant may not bring a compassionate release motion until either (a) the defendant has "fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf" or (b) 30 days lapse "from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." § 3582(c)(1)(A). To properly exhaust, the defendant must have "present[ed] the same or similar ground for compassionate release in a request to the Bureau as in [the] motion to the court." *United States v. Williams*, 987 F.3d 700, 703 (7th Cir. 2021). This administrative exhaustion requirement, though not a jurisdictional prerequisite, is a mandatory claims-processing rule that must be enforced when properly invoked. *United States v. Sanford*, 986 F.3d 779, 782 (7th Cir. 2021).

Second, the defendant must either be at least 70 years of age and have served 30 years of the sentence for which the defendant is currently imprisoned, § 3582(c)(1)(A)(ii), or demonstrate "extraordinary and compelling reasons" for release consistent with any applicable policy statement issued by the United States

Sentencing Commission, § 3582(c)(1)(A)(i). The only relevant policy statement, U.S.S.G. § 1B1.13, is outdated and not currently binding on district judges, but it provides a "working definition of 'extraordinary and compelling reasons' " that can "guide [judicial] discretion without being conclusive." *Gunn*, 980 F.3d at 1180. Subsections (A)–(C) of the Application Note to § 1B1.13 enumerate three specific circumstances that qualify as "extraordinary and compelling reasons": (A) diagnosis of a terminal illness or serious condition "that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover"; (B) aging-related health decline where a defendant is over 65 years old and has served at least ten years or 75% of his sentence; or (C) "death or incapacitation of the caregiver of the defendant's minor child" or the "incapacitation of the defendant's spouse or registered partner when the defendant would be the only available caregiver for the spouse or registered partner." Subsection (D) adds a catchall provision for "extraordinary and compelling reason[s] other than, or in combination with, the reasons described in subdivisions (A) through (C)." § 1B1.13, Application Note 1(D).

Third, the Court must consider "the factors set forth in [18 U.S.C. §] 3553(a) to the extent that they are applicable." § 3582(c)(1)(A).

## DISCUSSION

### I. Exhaustion

Whether Defendant has adequately exhausted his administrative remedies is an interesting query in this case. On October 26, 2020, Defendant submitted an administrative request to his warden seeking compassionate release due to his risk

4

of contracting COVID-19 coupled with his purported heightened risk of severe complications therefrom because of his underlying medical conditions. (Dkt. 59-1 at 14–18). He detailed his ulcerative colitis condition and asserted the condition and medication he takes to treat it (Entyvio) both suppress his immune system. (Dkt. 59-1 at 14–18). This, he argued, places him at an increased risk for severe, long-term complications should he contract COVID-19. (Dkt. 59-1 at 18). The warden denied Defendant's request in January 2021. (Dkt. 57-1).

Defendant then filed a *pro se* Motion for Compassionate Release in this Court, this time alleging he suffers from a "malignant neoplasm in his rectum, which is a form of rectal cancer." (Dkt. 50 at 6). He stated he is taking Entyvio to treat his rectal cancer but did not suggest it suppresses his immune system. (Dkt. 50 at 7).

As directed, Defendant's appointed counsel filed an Amended Motion for Compassionate Release, which admitted there is no evidence Defendant has been diagnosed with rectal cancer. (Dkt. 57 at 5). Counsel instead reverted to an argument Defendant made in his administrative request: that his use of Entyvio to treat his ulcerative colitis suppresses his immune system, rendering him more susceptible to severe complications should he contract COVID-19. (Dkt. 57 at 7).

The Seventh Circuit's decision in *Williams* suggests "issue exhaustion" is required in the compassionate release context. *See* 987 F.3d at 703–04. Here, Defendant has not properly exhausted his administrative remedies to the extent his request for compassionate release is based on a diagnosis of rectal cancer because he did not invoke that reason in his administrative request to his warden. (*See* dkt. 57-

1). Thus, the Court will not presently consider rectal cancer as a reason for compassionate release.[3] Nevertheless, Defendant's Amended Motion for Compassionate Release supplants his original *pro se* Motion, and the basis for compassionate release advanced therein was properly exhausted.

## II. Extraordinary and Compelling Reasons

The basis for Defendant's request for compassionate release is that Entyvio, his medication for ulcerative colitis, puts him at increased risk of severe infection from COVID-19 because it weakens his immune system. He makes this argument despite the fact he recovered from a COVID-19 infection in October 2020 (dkt. 61 at 18, 20) while he was taking Entyvio; his only reported symptoms associated with that diagnosis were a "scratchy throat" and a "little malaise" (dkt. 60 at 12), thus constituting a mild case of COVID-19. He further argues, though he has yet to receive the COVID-19 vaccine, it will not eliminate his risk of infection, citing its 95% effectiveness rate. (Dkt. 57 at 8).

The Court has previously accepted the proposition that extraordinary and compelling reasons exist where a prisoner suffers from a chronic condition from which he or she is not expected to recover and which places the prisoner at a heightened risk for severe illness or death from COVID-19.[4] *See United States v. Hamilton*, No.

---

[3] Even if Defendant had properly exhausted the issue of rectal cancer, the record—which includes hundreds of pages of Defendant's medical records—is completely devoid of any evidence suggesting Defendant has been diagnosed with rectal cancer. Defendant is admonished that attempts to mislead the Court can have severe consequences for him.

[4] It is perhaps time to revisit this standard to account for the rollout of the COVID-19 vaccinations within BOP. However, the Court need not reach this issue here

4:08-cr-40006, Dkt. 160 at 4 (C.D. Ill. Sept. 1, 2020); U.S.S.G. § 1B1.13 cmt. n.1(A); *see also United States v. Melgarejo*, 830 Fed. App'x 776, 778 (7th Cir. 2020) (suggesting there must be link between an underlying medical condition and an increased risk of severe COVID-19 infection to justify compassionate release due to COVID-19 pandemic). In relevant part, Defendant states:

> While the CDC has not recognized ulcerative colitis as a disease which increases the risks of contracting COVID-19, it has recognized that people with weakened immune systems, and those with cancer, are at greater risk of developing serious complications should they contract the virus.

(Doc. 57 at 8) (footnote citation omitted). It is notable that Defendant recognizes his medical condition (ulcerative colitis) has not been recognized as one which puts him at heightened risk for severe complications from COVID-19 and instead rests his argument on his use of Entyvio, which allegedly suppresses his immune system. It is unclear whether Defendant's use of a medication which does or could suppress his immune system could meet the standard previously adopted by the Court, particularly because there is no indication whether Defendant will be treated with Entyvio indefinitely (the standard requires the medical condition be chronic and one from which the movant is not expected to recover). Accepting, *arguendo*, an answer in the positive, the Court finds Defendant has nevertheless failed to demonstrate extraordinary and compelling reasons warrant his release.

The CDC recognizes "immunocompromised state" as a condition which increases one's risk for severe illness from COVID-19. *People with Certain Medical*

---

because Defendant has not demonstrated extraordinary and compelling reasons even applying this liberal standard.

*Conditions*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last visited June 10, 2021).[5] Defendant cites to Entyvio's website to support his claim that Entyvio renders him "at increased risk for infections, including some serious infections," such as progressive multifocal leukoencephalopathy (PML). (Doc. 57 at 7). While Entyvio's website does indicate use of Entyvio can increase one's risk for "developing infections," (though it makes no mention of any risks associated with COVID-19 in particular), it also reports PML is extremely rare and "typically only occurs in patients who are immunocompromised," thus suggesting Entyvio itself does not cause one to be immunocompromised. *CORONAVIRUS (COVID-19) INFORMATION*, Entyvio, https://www.entyviohcp.com/covid19 (last visited June 10, 2021). In the Amended Motion, Defendant does not make the claim that he is, in fact, immunocompromised nor do his medical records indicate such. All available information therefore indicates it is unlikely he will develop PML or that use of Entyvio will cause him to be immunocompromised. In fact, emerging Johns Hopkins medical research suggests Defendant's use of Entyvio may have a neutral or even

---

[5] Specifically, the CDC indicates: "[h]aving a weakened immune system can make you more likely to get severely ill from COVID-19. Many conditions and treatments can cause a person to be immunocompromised or have a weakened immune system. Primary immunodeficiency is caused by genetic defects that can be inherited. Prolonged use of corticosteroids or other immune weakening medicines can lead to secondary or acquired immunodeficiency." *People with Certain Medical Conditions*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last visited June 10, 2021).

opposite effect with respect to COVID-19.[6] For these reasons, Defendant has failed to persuade that use of Entyvio suppresses the immune system to the extent that a person being treated with Entyvio is considered immunocompromised, meaning he has failed to demonstrate he suffers from an underlying condition that increases his risk for severe or fatal complications from COVID-19.

But even if he had, Defendant's prior COVID-19 infection undermines his argument. Recent CDC data indicates only 0.7% of those who have recovered from COVID-19 become reinfected with the virus, and those reinfections tend to be less severe that the initial infection. *COVID-19 Science Update*, CDC, https://www.cdc.gov/library/covid19/05072021_covidupdate.html (last visited June 10, 2021).[7] Not only did Defendant experience a very mild case of COVID-19, but he

---

[6] According to Johns Hopkins:
> IBD patients on immunosuppressive medications are in general, more susceptible to infection. Specifically, being on steroids or immunomodulators like azathioprine, 6-MP, or methotrexate can increase an IBD patient's risk for viral infections. To date, we do not have any specific research on COVID-19 in IBD patients . . . .
> Concerning biologics, anti-TNF therapies are associated with bacterial or even fungal infections more commonly. *Viral infections certainly can occur but are not as typical given the mechanism of the target (TNF). Vedolizumab (Entyvio) . . . [has] many fewer (or no) [viral] infections. There is actually emerging information that some of our anti-inflammatory medications like Humira may be protective of infections or of complications from COVID19*--but these are very preliminary studies.

*Meyerhoff Inflammatory Bowel Disease*, Johns Hopkins Medicine, https://www.hopkinsmedicine.org/inflammatory_bowel_disease_center/covid-19-guidance.html (last visited June 10, 2021) (emphasis added).

[7] The CDC website enumerates the following findings:
- SARS-CoV-2 reinfection was identified in 0.7% (95% CI 0.5-9%) of patients.
  - The mean number of days between 2 positive tests was 116 ± 21.

did so while taking the medication he argues increases his risk for serious illness from COVID-19. Based on the recent data from the CDC, it is unlikely that Defendant will become reinfected with COVID-19 or experience serious complications if he does become reinfected. This is especially true in light of Defendant's forthcoming access to the COVID-19 vaccine and the fact there are currently no documented cases of COVID-19 among inmates in his facility.

Finally, Defendant's argument about the COVID-19 vaccinations' 95% effectiveness rate is unavailing. While not perfect, "[c]urrently authorized vaccines in the United States are highly effective at protecting vaccinated people against symptomatic and severe [cases of] COVID-19," according to the CDC. *Interim Public Health Recommendations for Fully Vaccinated People*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/vaccines/fully-vaccinated-guidance.html (last visited June 10, 2021). They are especially effective at preventing "severe illness and death." *When You've Been Fully Vaccinated*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/vaccines/fully-vaccinated.html (last visited June 10, 2021). Although vaccination may be less effective for immunocompromised individuals, Defendant has not presently shown he is

---

- Reinfection appeared to have less severe clinical manifestations than the primary infection:
    - The 63 patients with a reinfection had significantly lower rates of pneumonia, heart failure, and acute kidney injury compared with patients with primary infection.
    - 2 deaths (3.2%) were associated with reinfection.

*COVID-19 Science Update*, CDC, https://www.cdc.gov/library/covid19/05072021_covidupdate.html (last visited June 9, 2021)

immunocompromised or that his immune system is suppressed to the extent he is at any particular risk above that shared by all individuals at this time. Thus, the Court finds sufficient reason to believe Defendant will be adequately protected upon inoculation; other courts agree. *See United States v. Miller*, Case No. 13-20928, 2021 WL 1115863, at *2 (E.D. Mich. Mar. 24, 2021) ("The court is aware of no scientifically derived evidence showing that severe complications or death from COVID-19 is likely, or even possible, after an individual has received a full vaccination regimen . . . . The risk of COVID-19 to Defendant's health does not warrant the extraordinary remedy of compassionate release." (citation omitted)); *United States v. Williams*, Criminal No. 16-251, 2021 WL 1087692, at *3–4 (D. Minn. Mar. 22, 2021) ("[T]he Court finds that any risk that Williams will be reinfected with COVID-19 is largely mitigated by the fact that he has been fully vaccinated against the virus . . . The Court recognizes Williams's concern that the vaccine's efficacy against new variants of COVID-19 is unknown; however, the Court finds this fear entirely speculative . . . .").

For the foregoing reasons, the Court finds Defendant has failed to persuade that extraordinary and compelling reasons justify compassionate release.

### III.    18 U.S.C. 3553(a) Factors

Even if Defendant could successfully establish extraordinary and compelling circumstances that warrant compassionate release, the Court would deny his request in light of the § 3553(a) factors. These factors include, *inter alia*, "the nature and circumstances of the offense," "the need for the sentence . . . to protect the public from further crimes of the defendant," and "the need for that sentence . . . to provide . . . correctional treatment . . . ." 18 U.S.C. § 3553(a). Defendant has a lengthy criminal

history, and he is presently serving time for serious drug offenses he committed while on probation; in fact, most of Defendant's criminal offenses were committed while he was on some form of supervised release. (*See* dkt. 27 at 11–16). This demonstrates a need for further specific deterrence and that the safety of the public would be jeopardized if Defendant were released in advance of what his sentence prescribes. Furthermore, it appears Defendant has misrepresented his medical conditions in a document submitted to the Court to justify his release, thus giving the Court reason to believe that further correctional treatment is necessary. It does not appear that Defendant is prepared to reenter polite society. Accordingly, the Court finds the § 3553(a) factors militate against release.

## Conclusion

IT IS THEREFORE ORDERED that Defendant's request for compassionate release (dkts. 50, 57) is DENIED.

SO ORDERED.

Entered this 11th day of June 2021.

s/ Joe B. McDade
JOE BILLY McDADE
United States Senior District Judge
